UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**NEXTEL OF NEW YORK, INC. and
SPRINT SPECTRUM L.P.,**

               Plaintiffs,

    -against-

**THE VILLAGE OF SLEEPY HOLLOW,**
THE VILLAGE OF SLEEPY HOLLOW
PLANNING BOARD, PLANNING BOARD
CHAIRMAN NICHOLAS ROBINSON,
DAVID PERLMUTTER, GEORGE
TANNER, GARY MALUNIS, EDWARD
McCARTHY, NICHOLAS CICCHETTI, in
their official capacities, constituting the
Village Planning Board, THE VILLAGE OF
SLEEPY HOLLOW BOARD OF
TRUSTEES, MAYOR PHILLIP E.
ZEGARELLI, DEPUTY MAYOR MARIO
DiFELICE, MARIA ROSE DeMELIA, KAY
BROWN GRALA, SANDRA MORALES,
ANDREW T. MURRAY, KENNETH G.
WRAY, in their official capacities,
constituting the Board of Trustees, and SEAN
McCARTHY, in his official capacity as
Building Department Superintendent,

               Defendants.

---

**CIVIL ACTION NO.**



**08 CIV. 0951**
**ECF CASE**

---

## <u>COMPLAINT</u>

Plaintiffs, Nextel of New York, Inc. ("Nextel") and Sprint Spectrum L.P. ("Sprint") (hereinafter collectively referred to as the "plaintiffs"), by their undersigned counsel, Snyder & Snyder, LLP, complaining of defendants, allege as follows:

## PRELIMINARY STATEMENT

1.  This action is brought under the federal Telecommunications Act of 1996. Plaintiffs seek, among other things, an order and judgment finding that the concerted actions of the Village of Sleepy Hollow Planning Board ("Planning Board") and Village Board ("Village Board") delayed and effectively denied plaintiffs' abilities to provide reliable federally licensed wireless service within the Village of Sleepy Hollow over the last three years in violation of federal law.

2.  Plaintiffs are licensed by the Federal Communications Commission (the "FCC") to provide wireless communication services throughout New York, including the Village of Sleepy Hollow.

3.  Plaintiffs each have a significant gap in reliable wireless coverage in the Village of Sleepy Hollow, as confirmed by defendants' own consultant.

4.  Plaintiff Nextel originally attempted to remedy its significant gap in coverage by applying to the Village to collocate a wireless communications facility on the roof of Village Hall at 28 Beekman Avenue, where plaintiffs' functionally equivalent competitors, Verizon Wireless and T-Mobile USA currently operate pursuant to approvals granted by the Village.

2

5.    After being informed by the Village that it would not lease space at Village Hall to Nextel, on October 26, 2004, Nextel applied to the defendant Planning Board to locate a wireless communications facility on the roof of the existing building located at 95 Beekman Avenue ("95 Beekman Avenue Facility").

6.    The proposed 95 Beekman Avenue Facility would merely consist of the installation of twelve (12) small panel antennas on the roof of the existing building with related equipment in the basement thereof.

7.    Without providing any specific reasons, the Planning Board expressed vehement opposition to the 95 Beekman Avenue Facility and instead of considering the merits of and processing the application for same, it arbitrarily forced Nextel to waste the next several months reviewing alternative locations. In fact, prior to considering the 95 Beekman Avenue Facility on the merits, one of the Planning Board members told Nextel that the application for 95 Beekman Avenue was "not going to happen."

8.    The Planning Board ultimately directed Nextel to construct a new tower in an existing Village-owned parking lot adjacent to Barnhart Park at the intersection of Andrews Lane and Elm Street (the "Andrews Lane Site").

9.    Nextel labored for eighteen (18) months to secure an agreement ("Agreement") with the defendant Village Board to locate a wireless

3

communications facility ("Andrews Lane Facility") at the Andrews Lane Site.

10. The Agreement will expire on April 12, 2008 if Nextel does not receive a building permit by that date.

11. After finally obtaining the Agreement from the Village Board for the Andrews Lane Facility, the Planning Board subjected plaintiffs to an additional fourteen (14) month review, despite the fact that the Village endorsed, recommended and directed Nextel to the Andrews Lane Site.

12. Upon information and belief, as a result of public opposition from members of the Senior Citizens' Center located on the same property as the Andrews Lane Site, members of the Village Board and Planning Board began to reconsider their position and no longer desired to locate a wireless communications facility at the Andrews Lane Site.

13. On December 20, 2007, more than three (3) years after Nextel originally made application to the Village to remedy its significant gap in wireless service, the Planning Board adopted a resolution ("Resolution") in connection with the Andrews Lane Facility.

14. Although purporting to be an "approval" resolution, the Resolution includes numerous unreasonable and overly burdensome conditions that bear no relationship to development of the Andrews Lane Facility, are not based on substantial evidence, require further Planning Board reviews and approvals, and cannot procedurally or physically be

4

fulfilled before Nextel's agreement with the Village expires in three (3) months.

15.    The Resolution, though couched as an "approval", was for all practical purposes a further delay and denial of plaintiffs' abilities to provide reliable wireless services within the Village.

16.    The Resolution, among other things, requires plaintiffs to submit additional plans and materials for review and approval by the Planning Board and its consultants. Thus, the so-called "approval" Resolution amounts to an interlocutory determination pursuant to which the Planning Board retained the right to make further determinations.

17.    Over the course of the more than three (3) year period in which plaintiffs sought to remedy their significant gap in reliable wireless service in the Village, defendants have pursued a concerted course of conduct intended to unreasonably delay and prohibit the provision of wireless services by plaintiffs within the Village of Sleepy Hollow.

18.    The actions complained of constitute a denial of the rights secured to plaintiffs under the federal Telecommunications Act of 1996 (Public Law 104-104, 110 Stat. 56), and Article 78 of the New York State Code of Civil Practice Law and Rules.

19.    Plaintiffs seek permanent injunctive relief and a writ of mandamus compelling defendants to immediately issue all permits, approvals and leases required by the Village of Sleepy Hollow for plaintiffs to install

the 95 Beekman Avenue Facility and/or the Andrews Lane Facility, without the conditions that are arbitrary, capricious and impossible to satisfy.

## JURISDICTION AND VENUE

20.    This action is brought under 47 U.S.C. §332(c)(7)(B)(v), which authorizes expedited judicial review of actions brought under §332(c)(7)(B)(v) of the Telecommunications Act of 1996 (the "TCA").

21.    Jurisdiction is vested in this Court pursuant to 28 U.S.C. §1343 and §1331 because this is a civil action that presents federal questions arising under the TCA. This Court has supplemental jurisdiction over any and all New York State Law claims pursuant to 28 U.S.C. §1367.

22.    Venue is proper in this district under the provisions of 28 U.S.C. §1391(a).

## THE PARTIES

23.    Plaintiff Sprint Spectrum L.P. is a Delaware limited partnership with offices located at 1 International Boulevard, Mahwah, New Jersey 07495. Plaintiff Sprint is duly authorized to conduct business in the State of New York.

24.    Plaintiff Nextel of New York, Inc. is a Delaware corporation with offices located at 1 North Broadway, White Plains, New York 10601.

6

Plaintiff Nextel is duly authorized to conduct business in the State of New York.

25. Plaintiffs provide a public utility service known as "commercial mobile radio service" (also referred to as "personal wireless service"), as those terms are defined under 47 U.S.C. §332(d)(1) and 47 U.S.C. §332(c)(7)(C)(i).

26. Plaintiffs have been authorized by the FCC to construct and operate a digital, mobile radio system in various parts of the United States, including the State of New York, and the Village of Sleepy Hollow.

27. Defendants, Village of Sleepy Hollow and the Village of Sleepy Hollow Board of Trustees, respectively, are a municipal corporation and its governing body, created under the laws of the State of New York, and each having an address at 28 Beekman Avenue, Sleepy Hollow, New York 10591. The Village Board empowered the Planning Board to grant special permit and site plan approval for the construction and installation of antennas and related telecommunications facilities, such as those proposed by plaintiffs. The Village Board has the authority to lease the Andrews Lane Site to plaintiffs.

28. Defendant, Village of Sleepy Hollow Planning Board is an administrative body authorized by the laws of the State of New York and the Zoning Code of the Village of Sleepy Hollow, to *inter alia*,

grant site plan and special permit approval for the type of installation proposed by plaintiffs.

29.    Defendant, Sean McCarthy, is the Building Department Superintendent. The Building Department Superintendent is charged with the duty of issuing building permits.

## FACTS COMMON TO ALL COUNTS

30.    Plaintiffs are authorized by the FCC to construct and operate a mobile radio network. Plaintiffs' services compete with both traditional landline telephone services, and other mobile communication providers. Plaintiffs' customers communicate using handsets that rely on a network of wireless base station facilities, or cell sites (comprised of antennas, radio equipment and related infrastructure), constructed and operated by plaintiffs.

31.    The delivery of reliable mobile radio services is only possible through a carefully designed network of cell sites, whose locations depend on natural and manmade features in the environment. Only through careful network siting is it possible to establish a seamless and reliable communications grid.

8

32.  To provide the services plaintiffs are licensed to provide, their networks must be capable of "handing off" radio signals to other wireless facilities in plaintiffs' systems.

33.  Where a gap in service exists, as it does in the Village of Sleepy Hollow, plaintiffs' subscribers, who may include the traveling public, as well as police, fire and emergency response agencies are unable to initiate, receive or maintain calls.

34.  In the Village of Sleepy Hollow, there is a significant gap in the wireless services plaintiffs are authorized to provide.

35.  To remedy gaps in service, plaintiffs' conduct studies to locate new antenna sites that would close the gaps and provide the necessary service. Unlike wire-line communications, the mobile radio services provided by plaintiffs cannot be piped to subscribers over the conventional landline telephone system. Rather, each site in plaintiffs' networks is itself a vital link in the wireless network upon which plaintiffs' customers rely.

36.  Consistent with the foregoing, and prompted by a need to close an existing gap in service, plaintiff Nextel initially made application to the Planning Board for a rooftop wireless communications facility at 95 Beekman Avenue to remedy its significant gap in service.

## 95 BEEKMAN APPLICATION

37.    On October 26, 2004, plaintiff Nextel filed a complete application ("95 Beekman Avenue Application") for a special permit with the Planning Board to locate a wireless communications facility on the roof of the existing building located at 95 Beekman Avenue, in the Village of Sleepy Hollow.

38.    The proposed facility at 95 Beekman Avenue consisted of twelve (12) small panel antennas on the roof of the building together with a 330 square foot equipment room in the basement. The 95 Beekman Avenue Facility did not require the construction of a new tower.

39.    The 95 Beekman Avenue Application was filed only after defendants rejected plaintiff Nextel's efforts to secure a location on Village Hall where other competing wireless carriers are and were located.

40.    Specifically, prior to the submission of the 95 Beekman Application and in accordance with the Village of Sleepy Hollow Zoning Code ("Zoning Code") and Final Generic Environmental Impact Statement accepted by the Planning Board on or about March 18, 2004 ("GEIS"), Nextel sought to collocate a wireless communications facility on the existing Village Hall building located at 28 Beekman Avenue where plaintiffs' competitors, Verizon Wireless and T-Mobile USA, operate existing wireless communications facilities.

41.    The GEIS identified and evaluated preferred locations for wireless communications facilities.

42.    By letter acknowledged September 17, 2004, Dwight Douglas, the Village Administrator confirmed that the Village would not permit Nextel to collocate at Village Hall. Nextel then filed an application with the Planning Board for the 95 Beekman Avenue Facility.

43.    The special permit application for the 95 Beekman Avenue Facility included the required application forms, a Memorandum in Support of the Application, and a full Site Plan. The Memorandum in Support of the Application included: (i) a demonstration that the requirements of the Village of Sleepy Hollow Zoning Code had been satisfied; (ii) a letter acknowledged by Dwight Douglas, Village Administrator, on September 17, 2004 confirming that the Village would not permit Nextel to collocate at Village Hall; (iii) a structural certification letter, signed and sealed by Robert E. Adair, P.E. of All-Points Technology Corporation, P.C., certifying that the existing building could structurally accommodate the proposed facility and that the facility would be constructed in accordance with the applicable structural standards; (iv) a copy of Nextel's FCC license; (v) the Affidavit of Abdallah Akroush, Nextel's radio frequency engineer, which included a technical demonstration that the Facility was necessary to remedy a significant gap in service; (vi) a Long Environmental Assessment

Form with a Coastal Assessment Form and Visual Addendum; (vii) visual renderings which demonstrated that the facility will not have a significant adverse visual impact on the surrounding area; and (viii) an Antenna Site FCC RF Compliance Assessment and Report, dated September 20, 2004, prepared by Pinnacle Telecom Group demonstrating that the Facility will comply with the FCC's limits regarding radio frequency exposure.

44.     On or about November 12, 2004, Nextel submitted an updated Antenna Site FCC RF Compliance Assessment and Report, dated November 10, 2004, signed and sealed by a New York state licensed professional engineer.

45.     In addition, the 95 Beekman Avenue Application established that the Facility would not have any adverse environmental, aesthetic or other impacts on the surrounding community, particularly in light of the fact that construction of a new tower was not required.

46.     The 95 Beekman Avenue Application demonstrated that the 95 Beekman Avenue Facility would remedy a significant gap in plaintiff's reliable service in the vicinity of the Site.

47.     On November 13, 2004, Nextel attended the Village of Sleepy Hollow Planning Board meeting for a preliminary discussion on the 95 Beekman Avenue Application.

48.     Despite the fact that Nextel previously submitted the letter acknowledged by Village Administrator Douglas confirming that Nextel could not collocate at the Village Hall Building, the Planning Board Chairman requested that the Village Planner re-confirm with the Village Administrator whether Nextel could collocate at Village Hall.

49.     The Planning Board refused to schedule a public hearing or make any of the required referrals in connection with the 95 Beekman Avenue Application and adjourned the matter until its next meeting on December 16, 2004.

50.     At the December 16, 2004 Planning Board meeting, the Planning Board admonished Nextel for even filing the 95 Beekman Avenue Application, told Nextel that the 95 Beekman Application was "not going to happen" and directed Nextel to look for a site consistent with the findings of the GEIS.

51.     The Planning Board never articulated any specific reasons for its hostility toward the 95 Beekman Application.

52.     Upon information and belief, the Planning Board's hostility toward the 95 Beekman Application was based on unlawful considerations including concerns over radio frequency emissions.

53.     The Planning Board refused to process the 95 Beekman Application and refused to make the required referrals or schedule the public hearing at the December 16, 2004 Planning Board meeting.

54. Nextel appeared again before the Planning Board in connection with the 95 Beekman Application on January 20, 2005. The Planning Board once again refused to process the 95 Beekman Application, declined to make the required referrals or schedule the public hearing and stated, without reason, that a facility at St. Teresa's Church was the preferred location over a facility at 95 Beekman Avenue.

55. At the January 20, 2005 Planning Board meeting, the Planning Board's attorney recused himself, presumably because his firm previously represented Nextel.

56. The 95 Beekman Avenue Application is still pending.

57. To date, the Planning Board has refused to schedule a public hearing on the 95 Beekman Avenue Application, despite the fact that New York State Village Law §7-725-b(6) requires that the public hearing on this complete application be scheduled within sixty-two (62) days from the day the application was received on October 26, 2004.

## GEIS

58. The GEIS was commissioned by the Planning Board in June 2002 to develop a comprehensive Village-wide wireless antenna siting plan, despite the fact that the Planning Board lacked any legislative authority to commission the GEIS and the Village Board had already adopted an ordinance regulating wireless communications facilities in 1998.

14

59. The Planning Board spent approximately two (2) years developing and reviewing the GEIS, prepared by the Village's wireless communications consultant, HDR/LMS.

60. The GEIS includes a scoring system and matrix to rank potential wireless communications facility locations.

61. The GEIS also includes a Preferred Options for Wireless Facilities table.

62. The GEIS primarily reviewed municipally-owned or institutional properties as the preferred location for wireless communications facilities.

63. On September 9, 2004, the Planning Board adopted an Environmental Findings Statement incorporating the matrix and associated Preferred Options for Wireless Facilities table as its recommended siting guide for wireless communications facilities.

64. The "preferred options" in the Preferred Options for Wireless Facilities table included the location of antennas on Village Hall, the location of antennas on St. Teresa's Church, construction of a new tower in Barnhart Park, and the construction of a new tower on the Village ambulance property.

65. In fact, Barnhart Park, the location of the so-called Andrews Lane Site, is the second highest scoring site in the scoring matrix contained in the GEIS, behind only St. Teresa's Church.

15

66.    The GEIS states that it contains "various stealthing technologies, that if incorporated, will significantly reduce potential visual impacts."

67.    A tower designed as a flagpole is the stealthing technology recommended for use at Barnhart Park.

68.    As part of the GEIS, the Village conducted a balloon test (simulating the height of a proposed tower for wireless communications facilities) in Barnhart Park and, using the balloon test data, the Planning Board's consultant developed a visual simulation of a proposed "flagpole" tower from Elm Street.

69.    The GEIS provides that "when an applicant appears before the Planning Board with an application for a site already studied within the [GEIS], a portion of the environmental review will have already been prepared and considered."

70.    Both the GEIS and the Village of Sleepy Hollow Zoning Ordinance contain an unexplained preference for locating wireless communications facilities on Village owned property.

## St. Teresa's Church

71.    As an alternative to the 95 Beekman Application, the Planning Board and its consultants directed Nextel to pursue locating a facility in the steeple of St. Teresa's Church, located in the vicinity of 95 Beekman Avenue.

16

72.   Such direction to pursue St. Teresa's Church was given in spite of the fact that Nextel previously submitted letters to the Planning Board indicating St. Teresa's Church's refusal to allow Nextel to locate a wireless communications facility on the church building.

73.   Over the course of the next several months, the Planning Board's radio frequency consultant, HDR/LMS, unsuccessfully attempted to convince St. Teresa's Church to enter into an agreement with Nextel.

74.   On or about March 3, 2005, St. Teresa's Church again informed Nextel that it would not enter into a lease agreement with Nextel to locate a wireless communications facility on the church building.

**Andrews Lane Site**

75.   In light of St. Teresa's Church's decision and in accordance with the direction of the Planning Board, Nextel's representatives reviewed the feasibility of constructing a new tower in either Barnhart Park or at the ambulance property, both of which are listed in the GEIS as preferred locations for a wireless communications tower.

76.   On or about April, 2005, the Village proposed to Nextel that it locate a wireless communications tower in an existing parking lot owned by the Village directly adjacent to Barnhart Park at the intersection of

Andrews Lane and Elm Street. This is the genesis of the "Andrews Lane Site."

77. The Andrews Lane Site is also in close proximity to the ambulance property.

78. At this same time, the Village Board was also considering the construction of a Senior Citizens' Center on the same property as the Andrews Lane Site.

79. Over the course of the next year Nextel worked with the Village to negotiate an agreement to locate a wireless communications tower at the Andrews Lane Site.

80. On March 28, 2006, the Board of Trustees authorized the mayor to enter into a lease agreement with Nextel for the Andrews Lane Site, subject to Nextel obtaining a special permit from the Planning Board.

81. More than six (6) months later, on October 12, 2006, the mayor finally signed the lease Agreement with Nextel for the Andrews Lane Site, but the Agreement was contingent upon Nextel obtaining all necessary approvals, including a building permit. The Agreement also required Nextel to obtain a building permit within eighteen (18) months or by April 12, 2008.

82. Four days after finally receiving a signed Agreement, on October 16, 2006, Nextel immediately supplemented the 95 Beekman Application to include the Andrews Lane Site as an alternative.

18

83.    Consistent with the Agreement, Nextel's proposed facility ("Andrews Lane Facility") at the Andrews Lane Site consisted of a ninety-two (92') foot flagpole with six (6) panel antennas concealed therein and a 240 square foot equipment shelter at the base thereof.

84.    The Andrews Lane Facility's design as a stealth flagpole is consistent with the recommendations of the GEIS.

85.    In connection with the Andrews Lane Facility, on October 16, 2006, Nextel submitted: (i) the Affidavit of Abdallah Akroush, Nextel's radio frequency engineer, which included a technical demonstration that the Facility is necessary to remedy a significant gap in Nextel's service; (ii) a structural certification letter signed by a New York State licensed professional engineer which certifies that the Andrews Lane Facility will be designed in accordance with the applicable structural standards and to support two (2) additional carriers; (iii) an Antenna Site FCC RF Compliance Assessment and Report, prepared by Pinnacle Telecom Group and signed and sealed by a New York State licensed professional engineer, demonstrating that the Andrews Lane Facility will operate in clear compliance with the FCC regulations regarding radio frequency emissions; (iv) a Long Environmental Assessment Form with a Visual Addendum and a Coastal Assessment Form; (v) the required Planning Board application forms; and (vi) a complete site plan including proposed landscaping.

19

86.    On November 17, 2006, the Planning Board made the required referral to the Waterfront Advisory Commission.

87.    On December 14, 2006, the Waterfront Advisory Commission found that the Andrews Lane Facility was not inconsistent with the Local Waterfront Revitalization Plan.

88.    On December 22, 2006, the Planning Board delayed action on the application for the Andrews Lane Facility by referring the application to the Zoning Board of Appeals for variances.

89.    On or about February 12, 2007, approximately 95 residents submitted a petition to the Village objecting to the location of the Andrews Lane Facility adjacent to the Village Senior Citizens' Center.

90.    Nextel redesigned its facility to eliminate any necessary variances and the Village Board agreed that no variances were required because the Andrews Lane Facility was proposed to be located on Village-owned property.

91.    On or about March 29, 2007, Nextel met with Donato R. Pennella, P.E. of Charles A. Manganaro Consulting Engineers (the Village's consulting engineer), the Building Department Superintendent Sean McCarthy, Owen Wells, AICP of Saccardi & Schiff, Inc. (the Village Planner) and Michael Musso of HDR/LMS (the Village's radio frequency engineering consultant) to confirm that there were no remaining planning issues related to the Andrews Lane Facility.

20

92.  Village Engineer Donato Pennella suggested that the antenna cables from the equipment building to the flagpole be located underground and that the flagpole be placed outside of the proposed fencing. Nextel agreed to accommodate these requests. No other structural, landscaping, design, height or other planning issues were raised by the Village or its consultants at the March 29, 2007 meeting.

93.  On or about April 18, 2007, Nextel submitted additional application materials to the Planning Board in accordance with the discussions at the March 29, 2007 staff meeting and in response to the prior comments of the Village consultants.

94.  The April 18, 2007 submission included a revised site plan indicating that (i) the proposed stealth flagpole had been *reduced* in height to eighty (80') feet in accordance with the requirements of the Village Zoning Code and the recommendations of the GEIS, and (ii) the equipment shelter had been relocated to meet the setbacks, thus eliminating the need for an application to the Zoning Board of Appeals for area variances.

95.  In addition, the April 18, 2007 submission included revised materials to indicate that the Andrews Lane Facility would, in addition to the Nextel equipment, include the equipment operated by plaintiff Sprint, thus promoting collocation as specifically requested by the Planning Board's radio frequency engineering consultant HDR/LMS.

21

96.    At the Planning Board meeting on April 19, 2007, the Planning Board once again refused to schedule a public hearing on the Andrews Lane Facility until the Village Board indicated it approved of Nextel locating at the Andrews Lane Site.

97.    The Planning Board had no comments relating to structural, landscaping, design, height or other issues, and in fact, a Planning Board member expressly stated that the Planning Board had no issues at all with Nextel's proposal.

98.    Upon information and belief, in the spring of 2007 new members of the Village Board were having second thoughts about moving forward with the Andrews Lane Facility based on political opposition.

99.    On April 24, 2007, Nextel appeared at a Village Board work session where two members of the Village Board opposed the Andrews Lane Facility illegally based on radio frequency emissions.

100.    On or about May 3, 2007, the Village directed plaintiffs to revise the site plan to blend with the Senior Citizens' Center on the Andrews Lane Site, based on drawings prepared by Sean McCarthy, the Village Building Superintendent.

101.    On June 4, 2007, Nextel submitted a revised plan to the Village, consistent with Mr. McCarthy's design, including a full landscaping plan.

22

102.    On June 18, 2007, HDR/LMS, the Village's radio frequency engineering consultant, issued a "Technical Review Report" effectively endorsing the Andrews Lane Site and confirming the following in connection with the Andrews Lane Facility: (i) the design is consistent with the visual mitigation measures described in the GEIS; (ii) the general site location is in accordance with the GEIS; (iii) the proposed 80 foot height is in accordance with the height requirements of the Zoning Code and the GEIS; and (iv) the facility complies with the FCC's regulations regarding radio frequency exposure.

103.    In the Technical Review Report, HDR/LMS stated that "[t]he height of the proposed monopole (80 ft agl) appears to be reasonable . . .."

104.    On July 17, 2007, the Village Board adopted a resolution indicating its concurrence with the Nextel site plan as modified to reflect the plan drawn by Mr. McCarthy.

105.    At its meeting in July, 2007, the Planning Board finally scheduled a public hearing on the Andrews Lane Facility for September 21, 2007.

106.    On September 21, 2007, almost a year after the 95 Beekman Application was amended to include the Andrews Lane Site as an alternative, the Planning Board held the first public hearing in connection with the Andrews Lane Facility.

107. During the September 21, 2007 public hearing, numerous residents spoke in general terms against the Facility. These expressions of concern came mostly from members of the Senior Citizens' Center on the Andrews Lane Site and a member of the Village Board, and were based primarily on perceived fears of adverse health effects from radio frequency emissions.

108. In response to the public opposition, the Planning Board adjourned the public hearing and requested **once again** that plaintiffs re-confirm that St. Teresa's Church was not a feasible alternative.

109. The Planning Board also requested that plaintiffs submit a "geotechnical investigation" of the Andrews Lane Site to determine whether the soils at the site could support the flagpole, despite the fact that the Village Engineer agreed that such a report could be submitted at the building permit stage after all land use approvals were issued.

110. On or about October 1, 2007, residents submitted an additional petition objecting to the Andrews Lane Facility based on unspecified generalized concerns regarding health, aesthetics, structural issues and property values.

111. As requested by the Planning Board, on or about October 8, 2007, plaintiffs once again contacted the representative of St. Teresa's Church and confirmed that the Archdiocese would not approve a lease agreement with plaintiffs.

24

112. On or about October 17, 2007, plaintiffs submitted a geotechnical report as requested by the Planning Board.

113. By memorandum dated October 18, 2007, the Village Engineer confirmed that, "Based on soil investigation provided, the conditions are suitable for proceeding with designing the support systems for the proposed structures" in connection with the Andrews Lane Facility.

114. After receiving strident community opposition once again, the Planning Board finally closed the public hearing on October 18, 2007.

115. However, the Planning Board refused to issue a decision at the October 18, 2007 meeting.

116. Upon information and belief, at its next meeting on November 15, 2007, the Planning Board had before it an approval resolution prepared by the Village Planner.

117. However, in the face of public opposition, the Planning Board again refused to issue a decision on the application since the Planning Board decided it needed to perform a site visit, despite the fact that the Andrews Lane Site is on Village owned property, was the location selected by the Village for plaintiffs' facility, and had been reviewed by the Planning Board for more than a year.

118. The Planning Board held a site visit on or about November 17, 2007, approximately one month after the public record had closed.

25

119. The next month, in December 2007, unbeknownst to plaintiffs, the Planning Board requested its consultant, HDR/LMS to review yet another alternative site on a different Village owned property.

120. By letter dated December 19, 2007, plaintiffs requested that the Planning Board attorney recuse himself, reminding him that his firm had previously represented plaintiffs on similar matters. The Planning Board attorney refused to recuse himself despite having previously recused himself at the Planning Board meeting on January 20, 2005.

121. At the December 20, 2007 meeting of the Planning Board, sixty-one (61) days after the close of the public hearing, the Planning Board introduced two new memoranda into the record: (i) a December 20, 2007 memorandum from the Village's radio frequency engineering consultant, Michael Musso from HDR/LMS; and (ii) a memorandum from Sean McCarthy regarding the site visit.

122. When plaintiffs' counsel requested copies of the new memoranda, submitted well after the close of the public hearing, counsel was admonished by the Planning Board Chairman to "not interrupt."

123. Plaintiffs were not provided copies of the newly introduced memoranda at the December 20, 2007 Planning Board meeting.

124. The Planning Board made a motion to adopt a draft approval resolution in connection with the Andrews Lane Facility and such motion failed to be adopted.

125.  As a matter of law, the Planning Board's failure to adopt the approval resolution resulted in the denial of the application for the Andrews Lane Facility.

126.  After the Planning Board was unable to provide a reason on the record for the defacto denial, it resolved to go into executive session for "advice from counsel."

127.  Building Department Superintendent Sean McCarthy attended the executive session.

128.  After coming out of the executive session, the Planning Board voted to approve the Andrews Lane Facility subject to several new and exceptionally onerous conditions that were not previously articulated and did not relate or pertain to issues that were discussed during the public hearings.

129.  Pursuant to Section 7-725-b(6) of New York State Village Law, the Planning Board was required to decide upon the application for the Andrews Lane Facility within sixty-two (62) days after the public hearing or by December 21, 2007.

130.  Upon information and belief, faced with the need to make a decision on plaintiffs' application for the Andrews Lane Facility, and having been unable to adopt either an approval resolution or denial resolution, the Planning Board went into executive session for the purpose of concocting an "approval" resolution with conditions too onerous for

the plaintiffs to fulfill, at least before the expiration of the Agreement,

if at all.

131.    A copy of the "approval" Resolution is attached hereto as Exhibit 1.

### The "Approval" Resolution

132.    While purporting to be an "approval" resolution, the Resolution

contains unreasonably burdensome conditions bearing no rational

relationship to the Andrews Lane Facility. These conditions are

intended to further delay and prevent plaintiffs from providing reliable

wireless services within the Village of Sleepy Hollow.

133.    Condition #1 of the approval resolution requires that:

> "Prior to the issuance of a building permit, the submission of a
> structural/deep-type foundation design and analysis, consistent
> with the structural analysis scope outlined in the HDR/LMS
> June 2007 Technical Review Report and the comments in the
> Charles A. Manganaro April 17, 2007 memorandum.
> Additional wind stress greater than those referred to in the
> HDR/LMS report and the Charles A. Manganaro
> memorandum, taking into account the historic wind conditions
> of the Village including the tornado of July 2006, may be
> deemed appropriate by the Building Inspector to include in the
> analysis for the purposes of assessing the structure's integrity.
> As a measure to protect against slope settlement/sliding, the
> Applicant shall design and construct terraced walls sufficient
> for, and including the planting of trees to assist in stabilization
> of the slope subject to the satisfaction of the Building
> Department."

134.    Condition #1 does not identify any specific construction standards.

28

135. Condition #1 imposes requirements more stringent than the New York State Building Code.

136. Condition #1 grants unlimited and unfettered authority to the Building Inspector by requiring that "additional wind stress greater than those referred to in the HDR/LMS report and the Charles A. Manganaro memorandum, taking into account the historic wind conditions of the Village including the tornado of July 2006, may be deemed appropriate by the Building Inspector . . .."

137. Condition #1 requires plaintiffs to construct terrace walls and plant trees *off-site* for an existing condition unrelated to the Andrews Lane Facility.

138. There is no evidence in the record of slope settlement or sliding or the need for slope stabilization as subsumed in the Resolution.

139. The area of the slope is not on the same property as the Andrews Lane Site and not under the control of plaintiffs.

140. Upon information and belief, the Senior Citizens' Center on the same property as the Andrews Lane Site is constructed at the top of the slope referred to in the Resolution. Yet, off-site terracing was not required for construction of the Senior Citizens' Center as it was for the Andrews Lane Facility.

141. The Andrews Lane Facility is set back from the top of the slope.

29

142.   The geotechnical report submitted by plaintiffs on October 17, 2007 did not indicate a need for off-site terracing.

143.   Condition #2 of the approval resolution requires that:

"Prior to the issuance of a building permit, submission to the Village for approval by the Planning Board and Building Department of an independent engineering study of the integrity of the hillside on the northern boundary of the site to ensure the stability of the equipment, plantings, and other features related to the facility (including the monopole, all associated equipment, plantings and other features related to the facility) as depicted on the latest plans dated August 2, 2007 prepared by Tectonic Engineering. Provisions of bank stabilization will be required as per the recommendations of the independent study."

144.   There is no evidence in the record of slope settlement or sliding or the need for slope stabilization.

145.   The area of the slope is not on the same property as the Andrews Lane Site and not under the control of plaintiffs.

146.   Upon information and belief, the Senior Citizens' Center on the same property as the Andrews Lane Site is constructed at the top of the slope referred to in the Resolution. Yet, off-site terracing was not required for construction of the Senior Citizens' Center as it was for the Andrews Lane Facility.

147.   The Andrews Lane Facility is set back from the top of the slope.

148.   The geotechnical report submitted by plaintiffs on October 17, 2007 did not indicate a need for off-site terracing.

30

149.   Condition #2 of the approval resolution requires further time consuming and costly reviews and approvals by the Planning Board, for which there is no support anywhere in the record.

150.   Condition #3 of the approval resolution requires the submission of an extensive landscape plan for the approval of the Planning Board and Building Department prior to the issuance of a building permit.

151.   The Planning Board never objected to Nextel's landscape plan for the Andrews Lane Facility during the nearly 14 month review process.

152.   The landscaping plan in Condition #3 requires the planting of trees outside plaintiff's lease area and off site of the Andrews Lane Site.

153.   There is no evidence in the record to support the need for such an extensive landscaping plan.

154.   Condition #3 requires further time consuming and costly reviews and approvals by the Planning Board, for which there is no support in the record.

155.   Condition #4 of the approval resolution provides that:

"The monopole shall be of a height no taller than seventy (70) feet unless the Applicant submits documentation to the satisfaction of the Village's consulting engineer and Planning Board, prior to issuance of a building permit, that sufficient coverage can not be obtained unless the monopole is constructed to a height of eighty (80) feet. Coverage maps for Nextel and Sprint operations should be submitted using the same model and approaches and software packages that were used in the Application submittals."

31

156.    Nextel agreed to lower the height of the proposed flagpole to 80 feet from its originally proposed 92 feet in an effort to comply with the height requirements of the Zoning Code and the recommendations of the GEIS.

157.    The Planning Board's wireless communications consultant confirmed that the proposed height of eighty (80') feet is reasonable.

158.    There is no evidence in the record that supports lowering the height of the Andrews Lane Facility to seventy (70') feet, or that the proposed facility will be able to operate at this arbitrarily reduced height.

159.    Condition #4 requires further time consuming and costly reviews and approvals by the Planning Board.

160.    Condition #4 is an impermissible delegation of authority by the Planning Board to its consultant.

161.    Condition #5 of the approval resolution provides that:

"Prior to the issuance of a building permit, submission of a statement with regard to Nextel's commitment and schedule to maintain all visible aspects of the installation including, but not limited to, the monopole, American flag, and equipment building. The flag shall not be illuminated, it shall be maintained by Nextel in accordance with appropriate respect accorded to the American flag and appropriate guidelines, including but not limited to the raising and lowering of the flag daily, and it shall be replaced by Nextel annually, at a minimum."

162.    There is no evidence in the record of any objections to the proposed flag lighting.

163. Upon information and belief the condition requiring plaintiffs to raise and lower the flag daily was intended to unreasonably burden plaintiffs.

164. Condition #6 of the approval resolution provides that:

"Prior to the issuance of a building permit, submission of fully detailed construction plans for review and approval by the Village's Building Department detailing the proposed improvements to the limits shown on the Plans prepared by Tectonic Engineering, last revised August 2, 2007 and including pavement and landscaping that extend to the Senior Center building footprint. The plans shall also incorporate a grading plan including a suitable slope stabilization consisting of a retaining wall for the proposed area extending to the north of the existing fence, which will be constructed as part of the site work improvements to satisfy site plan compliance with the proposed scope of work."

165. There is no evidence in the record of slope settlement or sliding or the need for slope stabilization.

166. The area of the slope is not on the same property as the Andrews Lane Site and not under the control of plaintiffs.

167. Upon information and belief, the Senior Citizens' Center on the same property as the Andrews Lane Site is constructed at the top of the slope referred to in the Resolution. Yet, off-site terracing was not required for construction of the Senior Citizens' Center as it was for the Andrews Lane Facility.

168. The Andrews Lane Facility is set back from the top of the slope.

33

169.    The geotechnical report submitted by plaintiffs on October 17, 2007 did not indicate a need for off-site terracing.

170.    Condition #6 requires plaintiffs to complete pavement and landscaping for the Senior Citizens' Center, which is outside of plaintiffs' lease area on property not within plaintiffs' control and is unrelated to the Andrews Lane Facility.

171.    Condition #6 is an impermissible delegation of authority by the Planning Board to the Building Inspector because the Planning Board alone is vested with the authority to review the site plan.

172.    Condition #11 of the approval resolution provides that:

"Submission of an annual written inspection report to the Building Inspector by no later than January 30th of each year on emissions and structural soundness. This report shall be supplemented, as appropriate, with updates on the status of any equipment consolidation that may become available due to migration to a single operating platform in the future or other technological advances, or any modifications made to the facility or the equipment."

173.    Condition #12 of the approval resolution provides:

"Once the facilities are operational, RF field measurements shall be conducted in the vicinity of the site to confirm that the general public maximum permissible exposure (MPE) level is not being exceeded. The field work shall be conducted with a shaped probe in order that cumulative measurements shall be reported immediately to the Village Building Department. The need to repeat such field measurements will be considered upon any renewal of this Special Use Permit."

174.   On April 18, 2007, plaintiffs submitted written documentation to the Planning Board demonstrating that the Andrews Lane Facility will comply with the FCC's standards regarding radio frequency emissions. Conditions #11 and #12, which imposed recurring, unlawful and burdensome conditions related to perceived adverse health impacts from radio frequency emissions, exceed any requirements of the FCC pertaining to radio frequency emissions.

175.   The Agreement between Nextel and the Village provides that "Landlord agrees to cooperate with Tenant, at no out of pocket expense to Landlord, in making application for and obtaining all licenses, permits and any and all other necessary approvals that may be required for Tenant's intended use of the Premises. . . . Landlord shall take no actions that would jeopardize Tenant's ability to obtain any and all such required permits. Nextel will have six (6) months to complete these tasks, with two (2) six (6) month extensions upon reasonable cause."

176.   The Agreement obligating the Village to enter into a lease agreement with Nextel will expire on April 12, 2008 if Nextel does not receive a building permit for the Andrews Lane Facility.

177.   The conditions imposed by the Planning Board are so burdensome that it is impossible for plaintiffs to comply with same and obtain a building permit before the April 12, 2008 expiration, especially in light

35

of the fact that conditions 2, 3 and 4 require Nextel to return to the Planning Board for further approvals.

178. By crafting an approval resolution with unreasonably burdensome conditions with which plaintiffs cannot comply before the expiration of the Agreement, the Planning Board has effectively denied Nextel's application.

179. In contrast to the Andrews Lane Facility, the 95 Beekman Avenue Facility, being a rooftop facility, would not require any slope stabilization or landscaping, as the Planning Board deemed necessary in connection with the Andrews Lane Facility.

180. The 95 Beekman Avenue Facility would not be obtrusive to the surrounding area.

181. The 95 Beekman Avenue Facility would not require any daily maintenance, such as the raising and lowering of the flag, as the Planning Board has deemed necessary in connection with the Andrews Lane Facility.

**Charges to Plaintiffs**

182. Defendants have charged plaintiffs more than $30,000.00 in consultants' fees in connection with their review of the Andrews Lane Facility.

36

183.    These charges included charges from the Planning Board attorney to draft the approval resolution, as well as charges for discussions with Village staff **after** the adoption of the Approval Resolution.

## AS AND FOR A FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS PURSUANT TO SECTION 332(c) OF THE TCA

184.    Plaintiffs repeat and reallege paragraphs 1 through 183 of the Complaint as though set forth in full herein.

185.    Section 332(c)(7)(B)(i)(II) of the TCA, provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof -- . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

186.    By refusing to process the 95 Beekman Avenue Application and including illegal, unreasonable conditions which will prevent the construction of the Andrews Lane Facility, effectively denying the Application, defendants have prohibited the provision of personal wireless service in violation of Section 332(c)(7)(B)(i)(II).

## AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS PURSUANT TO SECTION 332(c) OF THE TCA

187.    Plaintiffs repeat and reallege paragraphs 1 through 186 of the Complaint as though set forth in full herein.

37

188. Section 332(c)(7)(B)(iii) of the TCA, provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

189. By imposing conditions of approval that are unlawful, unreasonable, arbitrary and capricious and not based on evidence in the record, defendants have effectively denied the application for special permit and site plan approval in connection with the Andrews Lane Facility.

190. The effective denial of the Application is not based on substantial evidence and is violative of the rights secured to plaintiffs under 47 U.S.C. §332(c)(7)(B)(iii).

## AS AND FOR A THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS PURSUANT TO SECTION 332(c) OF THE TCA

191. Plaintiffs repeat and reallege paragraphs 1 through 190 of the Complaint as though set forth in full herein.

192. Section 332(c)(7)(B)(iv) of the TCA provides that: "No State or local government or instrumentality thereof may regulate the placement, construction and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to

38

the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. §332(c)(7)(B)(iv).

193.    Upon information and belief, the Planning Board's refusal to process the 95 Beekman Application was based on perceived health effects from radio frequency emissions in violation of §332(c)(7)(B)(iv) of the TCA.

194.    The Planning Board's effective denial of the application for the Andrews Lane Facility was based on unsubstantiated generalized community concerns regarding perceived health effects from radio frequency emissions, in violation of §332(c)(7)(B)(iv) of the TCA.

195.    Despite plaintiffs' demonstration of compliance with the FCC's regulations concerning radio frequency emissions, Conditions 11 and 12 of the Approval Resolution regulate the Andrews Lane Facility on the basis of radio frequency emissions in violation of §332(c)(7)(B)(iv) of the TCA, and are preempted by federal law.

196.    As such, plaintiffs are entitled to a judgment and order compelling defendants and their agents to issue all necessary permits and approvals, including a special permit, site plan approval and a building permit.

## AS AND FOR A FOURTH CLAIM FOR RELIEF AGAINST
## DEFENDANTS PURSUANT TO SECTION 332(c) OF THE TCA

197.    Plaintiffs repeat and reallege paragraphs 1 through 196 of the Complaint as though set forth in full herein.

198.    Section 704 of the TCA, as codified at 47 U.S.C. §332(c)(7)(B)(i)(I), provides that: "The regulation of the placement, construction, and modification of personal wireless service facilities by any state or local government or instrumentality thereof shall not unreasonably discriminate among providers of functionally equivalent services."

199.    Defendants' refusal to permit plaintiff Nextel to locate a wireless communications facility on the roof of Village Hall, where its functionally equivalent competitors Verizon Wireless and T-Mobile USA operate facilities, unreasonably discriminates against Nextel in violation of §332(c)(7)(B)(i)(I) of the TCA.

200.    Defendants' refusal to permit plaintiff Nextel to locate a wireless communications facility on the roof of 95 Beekman Avenue when its functionally equivalent competitors Verizon Wireless and T-Mobile USA operate wireless communications facilities on the nearby municipal building, unreasonably discriminates against Nextel in violation of §332(c)(7)(B)(i)(I) of the TCA.

201.    Defendants' refusal to permit plaintiffs to locate a wireless communications facility at the Andrews Lane Site when its

functionally equivalent competitors Verizon Wireless and T-Mobile USA operate wireless communications facilities on the nearby municipal building, unreasonably discriminates against plaintiffs in violation of §332(c)(7)(B)(i)(I) of the TCA.

## AS AND FOR A FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS PURSUANT TO SECTION 332(c) OF THE TCA

202.    Plaintiffs repeat and reallege paragraphs 1 through 201 of the Complaint as though set forth in full herein.

203.    Section 332(c)(7)(B)(ii) of the TCA, provides that "[a] State or local government or instrumentality thereof shall act on any request for authorization to place, construct or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

204.    By failing to process the 95 Beekman Application that was filed more than three (3) years ago, the Planning Board has unreasonably delayed the 95 Beekman Application in violation of §332(c)(7)(B)(ii) of the TCA.

## AS AND FOR A SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS PURSUANT TO SECTION 332(c) OF THE TCA

205.    Plaintiffs repeat and reallege paragraphs 1 through 204 of the Complaint as though set forth in full herein.

206.    Section 332(c)(7)(B)(ii) of the TCA, provides that "[a] State or local government or instrumentality thereof shall act on any request for authorization to place, construct or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

207.    The Resolution adopted by the Planning Board contained several conditions (2, 3 and 4) requiring plaintiffs to submit new additional information to the Planning Board and its consultants, thus subjecting plaintiffs to further reviews and approvals by the Planning Board. Such conditions and related Planning Board reviews amount to an unreasonable delay in violation of § 332(c)(7)(B)(ii) of the TCA.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS PURSUANT TO SECTION 332(c) OF THE TCA

208.    Plaintiffs repeat and reallege paragraphs 1 through 207 of the Complaint as though set forth in full herein.

209.    Section 332(c)(7)(B)(iii) of the TCA, provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

210.    At the Planning Board meeting on December 20, 2007, the Planning Board's first vote to adopt an approval resolution in connection with the Andrews Lane Facility failed, despite the fact that a quorum of the Planning Board was present.

211.    Under New York State law, the failure to adopt the approval resolution resulted in a denial of the special permit and site plan application for the Andrews Lane Facility, which denial was not based on substantial evidence and is violative of the rights secured to plaintiff under 47 U.S.C. §332(c)(7)(B)(iii).

## AS AND FOR A EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS PURSUANT TO FEDERAL LAW

212.    Plaintiffs repeat and reallege paragraphs 1 through 211 of the Complaint as though set forth in full herein.

213.    Section 704 of the TCA, as codified at 47 U.S.C. §332(c)(7)(B)(i)(I), provides that: "The regulation of the placement, construction, and modification of personal wireless service facilities by any state or local government or instrumentality thereof shall not unreasonably discriminate among providers of functionally equivalent services."

214.    Section 62-22.2(E) of the Village of Sleepy Hollow Zoning Code provides that, "The siting of a communications facility on property owned by the Village of Sleepy Hollow shall be encouraged."

215.  The Planning Board directed plaintiff Nextel to construct a new tower on Village-owned property rather than construct a rooftop wireless communications facility at 95 Beekman Avenue, which is privately owned.

216.  The Village's stated preference for the location of wireless communications facilities on municipal property, as opposed to applications to locate wireless communications facilities on private property is a violation of the equal protection clause of the United States Constitution.

## AS AND FOR A NINTH CLAIM FOR RELIEF<br>AGAINST DEFENDANTS UNDER NEW YORK LAW

217.  Plaintiffs repeat and reallege paragraphs 1 through 216 of the Complaint as though set forth in full herein.

218.  Pursuant to CPLR Section 7803(4), the exclusive standard for review of an agency's fact finding determinations is whether such determinations are supported by "substantial evidence."

219.  Conditions 1, 2, 3, 4, 6, 11 and 12 are not based on substantial evidence in the written record.

220.  As such, plaintiffs are entitled to a judgment and order striking conditions 1, 2, 3, 4, 6, 11 and 12 from the approval resolution.

44

## AS AND FOR A TENTH CLAIM FOR RELIEF
## AGAINST DEFENDANTS UNDER NEW YORK LAW

221.    Plaintiffs repeat and reallege paragraphs 1 through 220 of the Complaint as though set forth in full herein.

222.    Under CPLR Section 7803(3) an agency's final determination will be overturned to the extent that it is arbitrary and capricious or an abuse of discretion.

223.    Conditions 1, 2, 3, 4, 5 and 6 are arbitrary and capricious as they do not reasonably relate to the Andrews Lane Facility.

## AS AND FOR A ELEVENTH CLAIM FOR RELIEF
## AGAINST DEFENDANTS UNDER NEW YORK LAW

224.    Plaintiffs repeat and reallege paragraphs 1 through 223 of the Complaint as though set forth in full herein.

225.    Article 7 ("The Open Meetings Law"), Section 103 of the New York State Public Officers law provides that every meeting of a public body shall be open to the public, except for executive sessions called in accordance with enumerated purposes and procedures espoused in Section 105 of the Public Officers Law. N.Y. Public Officers Law §103(a) (McKinney 2007).

226.    The executive session entered into by the Planning Board at its meeting on December 20, 2007 was not validly entered into in

45

accordance with one of the enumerated purposes in Section 105 of the Public Officers Law.

## AS AND FOR A TWELFTH CLAIM FOR RELIEF
## AGAINST DEFENDANTS UNDER NEW YORK LAW

227.    Plaintiffs repeat and reallege paragraphs 1 through 226 of the Complaint as though set forth in full herein.

228.    Section 7-725-b(6) of New York State Village Law requires the Planning Board to conduct a public hearing on a special permit application within sixty-two days from the day an application is received.

229.    To date, the Planning Board has not scheduled a public hearing on the 95 Beekman Application, which was filed more than 62 days ago.

230.    The Planning Board's failure to schedule the public hearing on the 95 Beekman Application violates Section 7-725-b(6) of New York State Village Law.

## AS AND FOR A THIRTEENTH CLAIM FOR RELIEF
## AGAINST DEFENDANTS UNDER NEW YORK LAW

231.    Plaintiffs repeat and reallege paragraphs 1 through 230 of the Complaint as though set forth in full herein.

232. Section 7-725-b(6) of New York State Village Law requires the Planning Board to decide upon a special permit application within sixty-two days after the hearing.

233. The Resolution, adopted sixty-one days after the close of the public hearing, contained numerous conditions requiring further reviews and approvals of the Andrews Lane Facility by the Planning Board and its consultants and therefore does not constitute to a decision within the proscribed sixty-two day period.

234. The Planning Board's failure to decide upon plaintiffs' special permit application for the Andrews Lane Facility within sixty-two days after the close of the public hearing violates Section 7-725-b(6) of New York State Village Law.

## AS AND FOR AN FOURTEENTH CLAIM FOR RELIEF AGAINST DEFENDANTS UNDER NEW YORK LAW

235. Plaintiffs repeat and reallege paragraphs 1 through 234 of the Complaint as though set forth in full herein.

236. The consultants' fees charged by defendants to plaintiffs constitute an impermissible tax and fee exaction and an unauthorized and wholly unlawful exercise of the Village's powers of taxation, are arbitrary and capricious in violation of Article 78 of the New York State CPLR, and

violative of plaintiffs' rights to due process and equal protection under federal and New York State constitutions.

**WHEREFORE**, plaintiffs respectfully demand judgment of this Court on all of its Claims for Relief and a judgment and order which:

(1)   strikes the unlawful conditions of the Resolution;

(2)   compels defendants and their agents to issue any and all approvals, leases and permits, including, but not limited to, a building permit by the Building Inspector, required for plaintiffs to construct, operate and maintain the Andrews Lane Facility as proposed by plaintiffs;

(3)   compels defendants and their agents to issue any and all approvals and permits, including but not limited to building permit by the Building Department Superintendent, required for plaintiffs to construct, operate and maintain the 95 Beekman Avenue Facility;

48

(4)   refunds some or all of the more than $30,000.00 in fees unlawfully charged to plaintiffs by the defendants; and

(5)   grants plaintiffs such other, further and different relief as the Court may deem just and proper.


Robert D. Gaudioso (ID #RG 3829)
Snyder & Snyder, LLP
94 White Plains Road
Tarrytown, NY 10591
(914) 333-0700


Dated: January 28, 2008
       Tarrytown, New York 10591

Z:\SSDATA\WPDATA\SS6\NEXTEL\ZONING\SLEEPYHO\Litigation\Complaint2cmb.doc

Exhibit 1

RECEIVED

DEC 31 2007

DEPUTY
VILLAGE CLERK

December 20, 2007

# RESOLUTION
## FOR A NEGATIVE DECLARATION AND SPECIAL PERMIT AND SITE PLAN APPROVAL

WHEREAS, Nextel of New York, Inc. (the "Applicant") had previously submitted an initial proposal to co-locate a wireless communication facility on the roof of Village Hall, which was determined to be infeasible due to a lack of space; and

WHEREAS, on October 25, 2004, Nextel of New York, Inc. submitted an application for special permit and site plan approval for the installation of a wireless communication facility and associated equipment at 95 Beekman Avenue; and

WHEREAS, the Village of Sleepy Hollow Wireless Ordinance requires an Applicant to examine alternative sites and the Applicant attempted to arrange for location of the facility at St. Teresa's church as an alternative to the 95 Beekman Avenue site; and

WHEREAS, the Applicant has indicated that in its communications with St Teresa's, the church expressed that it was unwilling to enter into an agreement with Nextel; and

WHEREAS, on October 17, 2006, the Applicant submitted an Amended Special Permit Application for a wireless communication facility consisting of a 92-foot flagpole with panel antennas and an equipment shelter at an alternate location on Village-owned property at the corner of Andrews Lane and Elm Street (the "Site") in the vicinity of one of the locations identified in the Village's Wireless Communication Facilities GEIS (the "GEIS") (the "Application" or "Proposed Action"); and

WHEREAS, in response to Planning Board comments and to meet the Code's maximum height requirements, the height of the flagpole was reduced to 80 feet (and thus avoiding the need for an area variance), and the configuration of the panel antennas was adjusted to reflect combined Nextel and Sprint usage; and

WHEREAS, in response to comments from Village staff and consultants, the site plan was modified to minimize the amount of Senior Center parking that would be lost; and

WHEREAS, the Proposed Action was not studied in the context of the GEIS and at the time the GEIS was adopted, the Senior Center presently located on the property was not existing on the Site and the proposed new Senior Center was not proposed or designed; and

WHEREAS, the Site is at the top of a greater than sixty (60) foot bluff above the proposed residential redevelopment of the GM site and overlooking the Hudson River; and

WHEREAS, the Proposed Action intrudes into the viewshed when viewed from the GM property, the Senior Center (existing and proposed) and from the neighborhood in general; and

WHEREAS, during the public hearing, residents and members of the Planning Board expressed concerns about the aesthetics of the Proposed Action and the impact to the viewshed; and

December 20, 2007

WHEREAS, on November 17, 2007 the Planning Board conducted a site visit and viewed the proposed location from the GM property, the Senior Center and the surrounding neighborhood; and

WHEREAS, §62-22.2.E of the Village Code encourages the siting of communications facilities on property owned by the Village, and the Proposed Action is in the vicinity of one of the Preferred Options for Wireless Facilities adopted with the Village's Wireless Communications Facilities GEIS; and

WHEREAS, pursuant to Chapter 59A of the Village Code, the Proposed Action was reviewed by the Village of Sleepy Hollow Waterfront Advisory Committee ("WAC") for consistency with the goals and policies in the Village's Local Waterfront Revitalization Plan ("LWRP"); and

WHEREAS, after its review the WAC concluded that the Proposed Action is consistent with the overall goals and policies of the LWRP; and

WHEREAS, the Planning Board reviewed the project pursuant to §62-22.2 of the Village Code and considered the Amended Special Permit and Site Plan Applications at its November 16 and December 21, 2006, and April 19, May 17, June 21 and July 19, 2007 meetings; and

WHEREAS, a properly noticed public hearing was held before the Planning Board on September 20 and October 18, 2007, at which time those wishing to be heard were given the opportunity to speak; and

WHEREAS, in connection with its review and assessment of the Application, the Planning Board has reviewed the following materials:

1. Planning Board Application Form and Planning Board Escrow Agreement
2. Amended Special Permit Application cover letter and package from Snyder & Snyder, LLP dated October 16, 2006 and including:
    a. Affidavit from Abdallah Akroush dated September 2006, with service coverage maps and Radio Frequency Engineering Report
    b. Structural Capacity letter from Tectonic Engineering & Surveying Consultants P.C., dated May 10, 2006
    c. Antenna Site FCC RF Compliance Assessment and Report prepared by Pinnacle Telecom Group, dated June 22, 2006
    d. Full Environmental Assessment Form dated June 16, 2006, with Visual Addendum and Coastal Assessment Form
3. Amended Special Permit Application cover letter and package from Snyder & Snyder, LLP dated April 18, 2007 and including:
    a. Affidavit from Anoop Jaikumar dated April 12, 2007, with service coverage maps
    b. Affidavit from Hanafi Bradai dated April 18, 2007, with service coverage maps
    c. Antenna Site FCC RF Compliance Assessment and Report prepared by Pinnacle Telecom Group, dated April 10, 2007
    d. Cut sheets for typical chain link fencing and equipment shelter siding

2476/12/331097 V2

-2-

December 20, 2007

     e.  Proposed construction schedule
     f.  Nextel site maintenance checklist
     g.  Sprint site maintenance checklist

4. Cover letter from Snyder & Snyder, LLP dated August 28, 2007
5. Site Plan prepared by Tectonic Engineering & Surveying Consultants, P.C., last revised August 2, 2007
6. Geotechnical Evaluation prepared by JGI, dated October 17, 2007
7. Review memorandum prepared by HDR/LMS, dated February 2007
8. Technical Review Report prepared by HDR/LMS, dated June 18, 2007
9. Review memorandum prepared by Charles A. Manganaro Consulting Engineers, dated December 18, 2006 and updated April 17, 2007
10. Review memorandum prepared by Charles A. Manganaro Consulting Engineers, dated October 18, 2007
11. Review memorandum prepared by Saccardi & Schiff, Inc., dated November 16, 2006
12. Village of Sleepy Hollow Wireless Communication Facilities Locational Plan Generic Environmental Impact Statement
13. Series of form letters, dated June 4, 2007
14. Series of letters from The Sleepy Hollow Seniors, dated October 1, 2007
15. Site Inspection memorandum prepared by the Building Department, dated November 17, 2007
16. Review memorandum prepared by HDR/LMS, dated December 20, 2007.

NOW, THEREFORE BE IT RESOLVED, that after reviewing the Proposed Action, as conditioned and modified below, against the criteria set forth in Part 617.7(c) of the implementing regulations pertaining to Article 8 of the Environmental Conservation Law, Criteria for Determining Significance, the Planning Board, acting as Lead Agency, does hereby determine that the Proposed Action would not cause significant adverse impacts to the environment and that a Negative Declaration is so recorded. Specifically the Lead Agency has, on the basis of the entire record before it, determined that, as conditioned and modified below:

     a.  The Proposed Action will not result in a substantial adverse change in existing air quality, ground or surface water quality or quantity, or traffic or noise levels, and that the Proposed Action will not result in a substantial increase in solid waste production, or in the potential for erosion, flooding, leaching, or drainage.

     b.  The Proposed Action will not substantially interfere with the movement of any resident or migratory fish or wildlife species, impact a significant habitat area, have an adverse impact on a threatened or endangered species of animal or plant, or have any other significant adverse impact on natural resources.

     c.  The Proposed Action will not impair the environmental characteristics of a Critical Environmental Area.

     d.  The Proposed Action is consistent with the Village's current plans and goals as officially approved or adopted.

December 20, 2007

    e. The Proposed Action will not impair the character or quality of any important historical or archaeological resource, or of the existing neighborhood character.

    f. The Proposed Action will not result in a major change in the use of any energy resource.

    g. The Proposed Action will not create a hazard to human health.

    h. The Proposed Action will not create an adverse change in the intensity of use of land; and be it further

RESOLVED, that the Planning Board, on the condition that the conditions made a part of this Resolution are complied with and implemented, concurs with the findings of the WAC in regards to Policy 25A and Policy 25B and declares that the Proposed Action is consistent with the overall goals and policies of the Village's LWRP; and be it further

RESOLVED, that the Application for special permit and site plan approval, in accordance with the site plan as last revised on August 2, 2007 and defined in the recitals and as modified by the conditions as set forth below, is hereby granted approval, and the Planning Board Chairman is authorized to sign the plans (once revised in accordance with this resolution) and this resolution, and permits may be issued, subject to the conditions and modifications identified below:

1. Prior to the issuance of a building permit, the submission of a structural/deep-type foundation design and analysis, consistent with the structural analysis scope outlined in the HDR| LMS June 2007 Technical Review Report and the comments in the Charles A. Manganaro April 17, 2007 memorandum. Additional wind stress greater than those referred to in the HDR|LMS report and the Charles A. Manganaro memorandum, taking into account the historic wind conditions of the Village including the tornado of July 2006, may be deemed appropriate by the Building Inspector to include in the analyses for purposes of assessing the structure's integrity. As a measure to protect against slope settlement/sliding, the Applicant shall design and construct terraced walls sufficient for, and including, the planting of trees to assist in stabilization of the slope, subject to the satisfaction of the Village Building Department.

2. Prior to issuance of a building permit, submission to the Village for approval by the Planning Board and Building Department of an independent engineering study of the integrity of the hillside on the northern boundary of the site to ensure the stability of the hillside to adequately support the proposed facility (including monopole, all associated equipment, plantings, and other features related to the facility) as depicted on the latest plans dated August 2, 2007 prepared by Tectonic Engineering. Provisions of bank stabilization will be required as per the recommendations of the independent study.

3. Prior to issuance of a building permit, submission to the Village for the approval of the Planning Board and Building Department of a revised landscaping plan that

    a) creates a screen of evergreen plantings of no less than sixteen (16) feet to the west of the proposed monopole;

December 20, 2007

 b) includes a series of shrubs and trees of mixed varieties in the area around the
monopole to act as a buffer between the monopole and the Senior Center building.
Details of the plantings will be determined by the Village Building Inspector, but the
following guidelines are set forth:

  1) A portion of the approximate 8000 s.f. area to the east of the monopole –
currently shown as parking for the Senior Center – will be developed into a
landscaped area. The final dimensions of the planting area will be determined by
the Building Inspector, after the parking evaluation is completed.

  2) The landscape plan for this area shall include a series of taller trees such as red
maple and oak to be planted at a height of 20 feet, and evergreens (8-12 feet tall at
planting) to shield views of the facility.

 c) includes a series of trees of mixed variety and of a height comparable to the above
planting guideline along Elm Street and Andrews Lane sufficient to act as a buffer
between the monopole and other view points, subject to the satisfaction of the Planning
Board and the Building Department.

These items for the revised landscape plan will be in addition to the landscape plan
described on the current drawings. The final extent and details of the plantings will be
reviewed and approved by the Village Planning Board. A maintenance plan shall also be
included with the revised Landscape Plan. Maintenance of trees and shrubs, such as
supplemental watering for the first full growing season after planting, shall be described
in the landscape plan. A grower's guarantee on the trees should also be obtained. The
Applicant shall post a landscape maintenance bond with a minimum term of three (3)
years commencing upon issuance of a certificate of occupancy to guarantee maintenance
and replacement of landscaping during that period. The bond shall be in a reasonable
amount equal to a portion of the cost of landscaping as determined by the Building
Inspector and in a form satisfactory to the Village Attorney. The operator of the Site
shall be responsible for the maintenance of all landscaping required by this approval on
the Site.

4. The monopole shall be of a height no taller than seventy (70) feet unless the Applicant
submits documentation to the satisfaction of the Village's consulting engineer and
Planning Board, prior to issuance of a building permit, that sufficient coverage can not be
obtained unless the monopole is constructed to a height of eighty (80) feet. Coverage
maps for Nextel and Sprint operations should be submitted using the same model
approaches and software packages that were used in the Application submittals.

5. Prior to the issuance of a building permit, submission of a statement with regard to
Nextel's commitment and schedule to maintain all visible aspects of the installation
including, but not limited to, the monopole, American flag, and equipment building. The
flag shall not be illuminated, it shall be maintained by Nextel in accordance with
appropriate respect accorded to the American flag and appropriate guidelines, including
but not limited to the raising and lowering of the flag daily, and it shall be replaced by
Nextel annually, at a minimum.

6. Prior to issuance of a building permit, submission of fully detailed construction plans for
review and approval by the Village's Building Department detailing the proposed
improvements to the limits shown on the Plans prepared by Tectonic Engineering, last

December 20, 2007

revised August 2, 2007 and including pavement and landscaping that extend to the Senior Center building footprint. The plans shall also incorporate a grading plan including a suitable slope stabilization consisting of a retaining wall for the proposed area extending to the north of the existing fence, which will be constructed as part of the site work improvements to satisfy site plan compliance with the proposed scope of work.

7. The color for the monopole shall be white and applied with a matted finish to the extent feasible to reduce reflectivity.

8. The associated equipment and equipment shelter shall, subject to the approval of the Building Inspector, be of a color and material that is compatible with the surroundings, including the proposed Senior Center.

9. Within 30 days after the construction of the facility and prior to issuance of a certificate of occupancy, the submission of a survey of the actual monopole height and centerline height of each antenna array, a map of all trenches, utility runs and utility connections associated with the facility, documentation that the antennas, transformer, generator and all other equipment is properly grounded and in compliance with all applicable electrical codes, and specification sheets on all mechanical, structural, electrical or other type of equipment, including the back-up generator, shall be provided to the Village Building Department.

10. As outlined in Section 62-22.2G(1), submission of a written certification by a professional engineer to the Building Inspector within 45 days of initial operation that the facility is in compliance with the application and this approval resolution.

11. Submission of an annual written inspection report to the Building Inspector by no later than January 30th of each year on emissions and structural soundness. This report shall be supplemented, as appropriate, with updates on the status of any equipment consolidation that may become available due to migration to a single operating platform in the future or other technological advances, or any modifications made to the facility or the equipment.

12. Once the facilities are operational, RF field measurements shall be conducted in the vicinity of the site to confirm that the general public maximum permissible exposure (MPE) level is not being exceeded. The field work shall be conducted with a shaped probe in order that cumulative measurements (%MPE) can be determined for the wireless providers. The recorded field measurements shall be reported immediately to the Village Building Department. The need to repeat such field measurements will be considered upon any renewal of this Special Use Permit.

13. The posting of a bond, in an amount determined by the Village Engineer and in a form satisfactory to the Village Attorney, based on engineering estimates, to cover the cost of removing and disposing of the monopole, as required by Section 62-22.2O of the Village Code.

14. Any alteration of the facility, including replacing or changing of antennas or related equipment, increasing the electromagnetic emission of an antenna or a change in site conditions or facility location, shall be subject to the same procedure, rules and regulations applicable to the original application.

15. Construction shall be in strict conformance with the final approved drawings and site plans, and shall be inspected as appropriate during installation by the Village's consulting engineer.

December 20, 2007

16. No additional signs other than those required by governmental regulations or otherwise for safety shall be installed on or around the facility.
17. No additional exterior lights other than those required by governmental regulations or otherwise for safety shall be installed on or around the facility.
18. This approval shall expire one year after the date of this resolution if the Applicant has not obtained the required building permit or permits for construction in accordance with the approved plan and conditions.  With good cause shown, the Applicant may petition the Planning Board to extend the approval by no more than six months.

AND BE IT FURTHER RESOLVED that prior to the issuance of a building permit, all applicable professional review fees, environmental fees, and other Village fees related to the project shall be paid to the Village.

THE PLANNING BOARD OF THE
VILLAGE OF SLEEPY HOLLOW

_____          _____
Nicholas Robinson, Chairman                              Date

2476/12/331097 V2

-7-